**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **U.S. BANK NATIONAL ASSOCIATION,** **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **B-R PENN REALTY OWNER, LP.,** **Defendant.** | **NO.  21-0502** |

## <u>MEMORANDUM OPINION</u>

Plaintiff U.S. Bank National Association ("U.S. Bank") filed suit to foreclose on a $46 million mortgage loan made to B-R Penn Realty Owner, LP ("B-R Penn") ("the Mortgage Loan"), on the grounds that B-R Penn failed to resume making monthly payments following a six-month forbearance.[1]

At a bench trial the Court heard the testimony of Alexander Killick, head of the Special Servicing Group at CWCapital (one of the entities that serviced the Defendant's loan on U.S. Bank National Association's behalf) as well as Eric Blumenfeld (a real estate developer and the managing member of the Defendant entity's general partner); and admitted upon request of the parties loan documents and emails as well as the deposition transcripts of Killick, Blumenfeld, and Jeff Walsh (client relations manager at Berkadia Commercial Mortgage LLC).

Rule 52 of the Federal Rules of Civil Procedure requires that in an action tried on the facts without a jury "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a).  Under Rule 52, the plaintiff bears the burden of "demonstrat[ing] a factual and legal right to relief by a preponderance of the evidence." *Parker v. Long Beach Mortg. Co.*, 534 F. Supp.2d 528, 535-36 (E.D. Pa. 2008).  The Court "'does not

---

[1] The Court has jurisdiction over this matter pursuant to 18 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and the action is between citizens of different states.

view the evidence through a particular lens or drawn inferences favorable to either party,' and can appropriately make credibility determinations when necessary." *DLJ Mortg. Capital, Inc. v. Sheridan*, 975 F.3d 358, 371-72 (3d Cir. 2020) (quoting *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272-73 (3d Cir. 2010)).

## I.     FINDINGS OF FACT

The following is based on the parties' proposed findings of fact, testimony given and exhibits entered into evidence at the bench trial.  Unless otherwise noted, the facts are undisputed.

### A.  Loan Background

The Mortgage Loan was issued on or about October 14, 2011 to B-R Penn[2] by Berkadia Commercial Mortgage LLC ("Berkadia").  Berkadia and B-R Penn executed a series of loan documents, including a Multifamily Note effective October 14, 2011 (the "Note"), with a principal amount of $46 million.  To secure repayment on the Note, B-R Penn executed in favor of Berkadia a Multifamily Mortgage, Assignment of Rents and Security Agreement (the "Mortgage"), also effective October 14, 2011.  The Mortgage encumbers the "Lofts 640" apartment building located at 640 North Broad Street in Philadelphia, which is owned and operated by B-R Penn.

Under the terms of the loan, B-R Penn was to make monthly payments of principal and interest totaling $226,023.13,[3] due on the first day of each month.  Monthly payments would continue until the maturity date of the loan, at which point all outstanding unpaid principal would

---

[2] Real estate developer Eric Blumenfeld is the sole member and owner of B-R Penn Realty Manager LLC, which is the general partner of the Defendant entity, B-R Penn Realty Owner, LP; Blumenfeld also owns the limited partnership interest.

[3] As of March 2020, the last payment that B-R Penn made, $337,357.27 was due monthly, consisting of principal, interest, and escrow reserves.

be due and payable in a single "balloon payment."  The loan's maturity date was November 1,

2021.  The Note provides that:

> If an Event of Default has occurred and is continuing, the entire unpaid principal balance, any accrued interest, any prepayment premium payable . . . , and all other amounts payable under this Note and any other Loan Document, will at once become due and payable, at the option of Lender, without any prior Notice to Borrower (except if notice is required by applicable law, then after such notice). Lender may exercise this option to accelerate regardless of any prior forbearance.

Berkadia assigned the loan and endorsed the Note to the Federal Home Loan Mortgage

Corporation ("Freddie Mac").  Freddie Mac subsequently securitized the loan and assigned it to

Plaintiff U.S. Bank.[4]  B-R Penn's loan is one of more than seventy-five mortgage loans that have

been pooled together, securitized, and assigned to the FREMF 2012-K18 Mortgage Trust ("K18

Trust") as an investment vehicle for its certificate holders.  U.S. Bank is the Trustee of the K18

Trust.

Three entities act as servicers for the loan: Berkadia, KeyBank National Association

("KeyBank"), and CWCapital Asset Management LLC ("CW").  Berkadia, the original lender, is

the Primary or Sub-Servicer of the loan.  KeyBank is the Master Servicer, and CW is the Special

Servicer.  As the Primary Servicer, Berkadia served as the initial point-of-contact for billing

statements and borrower requests.  The loan was to be transferred to the Special Servicer CW to

resolve disputes or defaults.  The Pooling and Servicing Agreement ("PSA") governing the

servicers provided for transfers to special servicing in a number of circumstances, including if

"any Monthly Payment (other than a Balloon Payment) is sixty (60) days or more delinquent."

The loan could also be transferred to special servicing if:

> the Master Servicer or, with the approval of the Directing Certificateholder . . . the Special Servicer determines that (i) a default under any Loan is reasonably foreseeable, (ii) such default will materially impair the value of the related

---

[4] Securitization is the process by which cash flow producing assets, in this case commercial mortgages, are pooled together and securities paying a predictable rate of return are issued from them.

Mortgaged Property as security for such Loan or otherwise materially adversely affect the interests of Certificateholders, and (iii) the default either would give rise to the immediate right to accelerate the Loan or such default is likely to continue unremedied for the applicable cure period under the terms of such Loan (or, if no cure period is specified and the default is capable of being cured, for thirty (30) days)[.]

### B. First Forbearance Agreement

In 2020, B-R Penn requested a three-month period of forbearance, citing the COVID-19 pandemic's negative effect on rents from commercial and individual tenants. Berkadia and KeyBank granted the request, and agreed to forbearance—that is, not to pursue remedies for default—on the April, May, and June 2020 payments. During this three-month "Forbearance Period," B-R Penn's required monthly payments of principal, interest, and reserves would be deferred, and that deferred amount was to "be repaid without additional interest or prepayment premiums in no more than 12 equal monthly installments . . . remitted together with each regularly scheduled monthly installment[.]" No default interest or late charges were to be assessed on the deferred amounts, "nor [did] the Forbearance change the amortization schedule for the Loan." In other words, B-R Penn's monthly payments would pause for three months, and resume in June 2020, with the deferred amounts repaid in increments added to the resumed monthly payments.

### C. Second Forbearance Agreement

In July 2020, B-R Penn requested a three-month extension of the forbearance agreement, covering payments for July through September 2020. Following the request, an attorney acting on the lender entities' behalf sent B-R Penn an Amendment to the Forbearance Agreement ("Second Forbearance") and advised that the lender's countersignature would be "arrange[d]" upon receipt of a signed copy. B-R Penn signed and returned the Second Forbearance on July 17, 2020, and paid a $7,500 extension fee.

Under the Second Forbearance, B-R Penn's payments were to resume on October 1, 2020, with 1/24th of the deferred amounts to be repaid monthly, for total monthly payments of $407,119.21.  These monthly payments were to continue through October 2021, as the forbearance agreement left the November 1, 2021 maturity date unchanged.  Twelve monthly payments remained to be made between October 2020 and the loan's maturity date, meaning that half of the forborne amount would be repaid in monthly increments; the remainder would be repaid as part of the balloon payment.

On July 23, 2020, Berkadia employee Allen Sullivan emailed KeyBank a copy of the Second Forbearance and requested that KeyBank return a signed copy.  Amanda Earl, a KeyBank executive, signed the Second Forbearance on behalf of U.S. Bank.  Apparently not understanding that the Second Forbearance was now executed, KeyBank forwarded the agreement to CW for further approval.  CW employees failed to note that the agreement had already been executed and began a two-month process of deliberation in consultation with the Directing Certificateholder on whether to approve it.

In August and September 2020, B-R Penn requested updates on the status of the Second Forbearance through Sullivan at Berkadia, who in turn passed these requests on to Kate Goll at KeyBank.  Goll told Sullivan that CW was still considering whether to grant the Second Forbearance; as a result, B-R Penn was told repeatedly, and incorrectly, by Sullivan that final approval of the Second Forbearance was still pending.  Separately, Jeff Walsh at Berkadia emailed Elizabeth Galvani at B-R Penn on September 11, 2020 to inquire about the status of B-R Penn's September payment.  Galvani responded: "We believe September is the last month of forbearance and payment will begin in October.  Please let us know if this isn't the case."  Walsh replied with a partial confirmation: "Sorry for the confusion.  Looks like there was a 3 month

extension which we are still waiting for approval on.  You are correct, the payments will resume in October."  On September 17, Walsh emailed Galvani an October billing statement, which was prepared according to the Second Forbearance's terms: it requested total payment of $407,119.21 and bore the legend "Loan Subject to a Forbearance Agreement."

At the same time, Sullivan continued requesting updates from KeyBank about the status of the forbearance, asking on September 21: "Do we assume it is declined and inform the borrower?  The CRM [Walsh] prepared and sent the Oct 1 payment assuming it will be approved."  Two days later, on September 23, Felicia Everett-Rounds at CW emailed Goll to inform her that CW had denied the forbearance request.  Berkadia (through Sullivan) then informed B-R Penn that the second forbearance had been denied.  On September 24, Walsh emailed B-R Penn that approximately $1.6 million was due on October 10.[5]  That total represented: immediate payment in full for July, August, and September payments (*i.e.*, the amounts covered by the Second Forbearance), the October payment, and 1/12th of the April, May, and June payments (*i.e.*, the amounts covered by the initial forbearance agreement).  B-R Penn responded that it was not "in a position to make these payments."  After discussions between B-R Penn and Berkadia, Berkadia advised B-R Penn on October 2, 2020 that failure to make the $1.6 million payment would result in the loan being transferred to special servicing.

### D.  Default and Acceleration of the Loan

On October 7, B-R Penn sent a letter to Amanda Arleth at Berkadia composed and signed by Blumenfeld, requesting reconsideration of the denial and further forbearance.  The letter in full reads:

---

[5] The Court excluded testimony or documentary evidence of this payment demand in a pre-trial evidentiary ruling. As discussed more fully below, this ruling will be partially reconsidered.

Dear Ms. Arleth:

We are hereby requesting your reconsideration of our request to extend our forbearance period for an additional six months.  In addition we are also requesting a 12 month deferral of amortization as we all collectively work through a highly weakened market challenged by COVID-19 in addition to a much-needed capex campaign currently underway, there is no conceivable way for us to meet our obligations without your help.  At the time of the first modification, we were all hoping that this would solve a temporary problem.  However, COVID-19 has proven to be anything but temporary.

In summary, we are not in a position to commence interest payments for an additional six months and principal payments for 12 months.  Your support of our request will go a long way to putting us back on track and hopefully the world will also cooperate and heal around us as well.

I look forward to working with you and thank you for your assistance.

Sincerely,

Eric Blumenfeld

B-R Penn did not subsequently make any payment.  On October 15, Berkadia signed a General Servicing Request recommending the loan be transferred to special servicing.  The reason given for this recommendation was that, after the forbearance extension was purportedly denied, "Borrower informed Berkadia that they could not make their future mortgage payments." Berkadia contacted KeyBank to initiate the transfer to special servicing on October 18, "per sec. (a) pg. 6 under the definition of a Servicing Transfer Event."  On October 27, KeyBank transferred servicing of the loan to the Special Servicer, CW, through a "Notice of Servicing Transfer Event."  U.S. Bank formally declared a default and accelerated the loan on November 24 by issuing a Notice of Default and Acceleration through counsel and CW that declared the entire loan immediately due and payable.  Subsequently, CW "became aware in December 2020 or January 2021" that the Second Forbearance Agreement was fully executed.  U.S. Bank commenced this action to foreclose the mortgage in February 2021.

## II.     LEGAL FINDINGS AND DISCUSSION

### A.  U.S. Bank's Foreclosure Claim

"In a mortgage foreclosure action, the plaintiff must show the existence of an obligation secured by a mortgage, and a default on that obligation." *Chem. Bank v. Dippolito*, 897 F. Supp. 221, 224 (E.D. Pa. 1995).  Neither party disputes that B-R Penn had an obligation to repay the $46 million loan, secured by the Mortgage.  U.S. Bank argues that B-R Penn defaulted on its obligations by failing to make its October payment, or alternatively by failing to pay the outstanding balance on the loan at the November 2021 maturity date.  In response, B-R Penn argues that the existence of a default is muddied by the conflicting and incorrect communications made by the servicers as to the actual amount due in October and, even if it defaulted, the servicers' conduct should prevent U.S. Bank's recovery on various equitable grounds.

Despite the servicers' representations to B-R Penn in 2020, U.S. Bank has consistently maintained during this litigation that the Second Forbearance was valid.  According to U.S. Bank, B-R Penn defaulted on the loan when it failed to make the $407,119 payment required by the Second Forbearance not, as some of the contemporaneous notices claimed, because it also failed to make the July, August, and September payments.  And, U.S. Bank argues, even if the failure to make the October payment did not constitute a default, B-R Penn defaulted in November 2021 when it failed to pay the remaining balance of the loan.  As a result, U.S. Bank has provided two damages calculations—one that assumes default occurred in October 2020, and another that assumes it occurred in November 2021.  The difference between the two is the date from which late fees, default interest, and other fees began accruing; under either calculation, according to U.S. Bank, B-R Penn owes more than $46 million.

Monthly payment was indisputably due in October 2020, and not made; payment of the

remaining balance of the loan was also indisputably due in November 2021, and not made. Although two clear defaults appear to have occurred, B-R Penn argues that the servicers' failure to disclose the executed Second Forbearance and representations that it had been denied constituted misconduct. This misconduct, it argues, provides a defense excusing any default in October 2020.

### B.  B-R Penn's Counterarguments

Of the twenty-two, sometimes overlapping, affirmative defenses raised in its Answer, B-R Penn raises in substance only three in its Post-Trial Brief: that U.S. Bank's conduct, through its servicers,[6] (1) constituted anticipatory repudiation and material breach of the Loan Agreement, excusing B-R Penn from further performance; (2) amounted to fraud and bars recovery under the equitable doctrine of unclean hands; and (3) violated Freddie Mac's mortgage servicing guidelines. For the reasons set forth below, none of these defenses serve to bar U.S. Bank's recovery.

#### i.  *Material Breach by the Servicers*

B-R Penn first argues that the loan should not be foreclosed because U.S. Bank, through its servicers, anticipatorily repudiated the Second Forbearance Agreement by committing

---

[6] B-R Penn does not object to any action by the Plaintiff U.S. Bank itself other than instituting this action, and instead challenges purported "misconduct" by the servicers. U.S. Bank has not argued that it cannot be held responsible for the actions of its servicers. Under the PSA that governed the relationships between U.S. Bank as the loan's trustee and the various servicers, master servicer KeyBank and special servicer CW were empowered "on behalf of the Trustee, [to] agree to any modification, waver or amendment of any term or any Loan. . . . " The PSA also provided that KeyBank (and CW, if the loan was in special servicing) was responsible for handling any loan modification requests made by B-R Penn. With respect to the forbearance agreements, the servicers therefore acted within their express authority as U.S. Bank's agents. *See Wisler v. Manor Care of Lancaster PA, LLC*, 124 A.3d 317, 323-24 (Pa. Super. 2015) ("'Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters.' An agent with express authority also acquires implied authority, which 'exists in situations where the agent's actions are "proper, usual and necessary" to carry out express agency.'"). As the servicers' actions could be imputed to U.S. Bank in a breach of contract action, they can reasonably serve as the basis for an affirmative defense based on purported breach of the loan agreement's terms. *See Bucks v. Buckwalter*, 215 A.2d 625, 627 (Pa. 1966) ("[W]here one deals with an agent who acts within the scope of his authority and reveals his principal, the latter ordinarily is . . . liable for a breach of contract.").

material breaches of its express terms and by violating the implied covenant of good faith and fair dealing.[7]  B-R Penn argues that as a result of these breaches its obligations under the loan agreement were excused, and it had no duty to make any further payments.  The express breaches B-R Penn alleges are: "repeatedly" demanding payments that did not adhere to the schedule established by the Second Forbearance; transferring the loan to special servicing after B-R Penn failed to make an immediate $1.6 million payment; imposing penalties such as default interest and lender fees; accelerating repayment; and instituting this foreclosure action.

### a.  Anticipatory Breach

Turning first to B-R Penn's argument that U.S. Bank anticipatorily breached the Loan Agreement before the October 2020 payment was due the Court looks to Pennsylvania law,[8] pursuant to which an anticipatory breach requires "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so."  *2401 Pa. Ave. Corp. v. Fed. of Jewish Agencies of Greater Phila.*, 489 A.2d 733, 736 (Pa. 1985) (quoting *McClelland v. New Amsterdam Casualty Co.*, 185 A. 198, 200 (1936)).  Given that any anticipatory repudiation by U.S. Bank excusing B-R Penn from making its October payment would have had to have occurred prior to October 10, two sets of actions challenged by B-R Penn potentially serve as the basis for this argument.  First, the servicers "repeatedly" demanded immediate payment of $1.6 million; and second, the servicers failed to disclose to B-R Penn that the Second Forbearance had been executed.  B-R Penn argues that the first action breached the express terms of the contract, and the second breached the implied covenant of good faith and fair dealing that Pennsylvania

---

[7] This argument tracks the Fifteenth Affirmative Defense included in its Answer, which asserts: "Plaintiff's claim is barred because no Event of Default has occurred and because of Lender's pre-occurring breaches of contract and unlawful conduct, which excuses any performance by Borrower."

[8] The Loan Agreement is "governed by the laws of the Property Jurisdiction."  "Property Jurisdiction" is defined as "the jurisdiction in which the Land is located," with "Land" meaning the Lofts 640 lot in Philadelphia.

law imposes on every contract.  *See, e.g.*, *J.J. DeLuca Co., Inc. v. Toll Naval Assocs.*, 56 A.3d

402, 412 (Pa. Super. 2012).  Although addressed separately by B-R Penn, these are essentially

two components of the same argument—that the servicers caused B-R Penn to default on its

obligations by misleading it to believe the Second Forbearance had been denied.

1.  *Prior Rulings on Berkadia's Payment Demand*

Before addressing the merits of B-R Penn's argument, two preliminary issues relating to

the servicers' payment demands must be addressed: whether consideration of this portion of B-R

Penn's argument is precluded by either (a) the Court's ruling dismissing B-R Penn's breach of

contract counterclaim, or (b) the Court's subsequent ruling granting U.S. Bank's motion *in*

*limine* to exclude evidence relating to the September 24 payment demand by Berkadia that

formed the basis for the counterclaim.

The Court dismissed B-R Penn's counterclaim because:

> Borrower cites to no applicable law in support of its bald allegation that a single
> untimely payment demand, payment which Lender did not seek to collect and
> which Borrower declined to pay, excuses Borrower's repayment of a $46 million
> mortgage. . . . The loan sub-servicer's single request for payment while the
> forbearance period was in effect which the Lender neither sought nor pursued, does
> not amount to an absolute and unequivocal refusal by Lender to adhere to the terms
> of the Forbearance Agreement.  To the contrary, it is undisputed that Borrower
> made no payments during the six-month forbearance and thus received the benefit
> of the agreement.

*U.S. Bank Nat'l Ass'n v. B-R Penn Realty Owner, L.P.*, 2021 WL 2778553, at *2-3 (E.D. Pa. July

1, 2021).

This decision, U.S. Bank argues, created law of the case and precludes consideration of

B-R Penn's post-trial argument that the payment demands bar U.S. Bank's recovery.  The

doctrine of law of the case "posits that when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case."  *Christianson*

*v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460

U.S. 605, 618 (1983)).  In response, B-R Penn argues that the factual and legal contexts in which it raises this argument are different enough that the motion-to-dismiss ruling does not close off this line of argument.

First, B-R Penn argues that the Court only decided the breach of contract issue in relation to a standalone counterclaim, whereas B-R Penn now raises it as an affirmative defense.  Although suggesting that the legal requirements for a breach of contract counterclaim and a breach of contract affirmative defense may differ, B-R Penn has cited no law elucidating whether they do and, if so, how.  Second, it emphasizes that the motion-to-dismiss ruling was based on the Court's assessment of "a *single* untimely payment demand," and it now points to multiple payment demands by the servicers. Specifically, in addition to the September 24 email that formed the basis of its counterclaim, B-R Penn refers to two additional trial exhibits—emails from Amanda Arleth at Berkadia, in which Arleth reiterated the $1.6 million demand.  In the first, sent on September 29 after a call with Galvani, Arleth said:

> Pursuant to the Forbearance Agreement, failure to perform and make this loan current is an immediate transfer to special servicing. . . . The October payment will be due to be received by 10/10.  Please note that if these funds are not received, a transfer to special servicing will need to be submitted, which includes additional fees and no removal of default interest or late charges.

Later that day, Arleth again emailed Galvani:

> Please note that after reviewing the guidance provided by the Lender, if the payments are not received, a default will occur and an immediate transfer to special servicing will ensue.  I wanted to bring this to your attention to see if there was any way that the payments could be made before we have to transfer this over to special servicing.

On October 2, in the same email chain, Walsh told Galvani "if we do not receive confirmation that the past due payments are going to be made, we will need to take the appropriate steps and transfer this loan to the Special Servicer."  In addition to these several

demands, B-R Penn also points to a wider range of promised benefits under the Second

Forbearance that it was supposedly deprived of by the servicers' actions, beyond just the deferral

of the three months of payments.  B-R Penn's breach of contract argument is different enough in

both its rationale and its factual underpinnings that the law of the case doctrine does not

automatically preclude it.

A second prior ruling by the Court also poses a potential obstacle to B-R Penn's

anticipatory breach argument—the Court's exclusion of documentary or testimonial evidence

relating to the servicers' September 24 payment demand.  In support of its motion *in limine*, U.S.

Bank argued that B-R Penn was attempting to use the payment demand to relitigate its breach of

contract counterclaim, despite its dismissal.  This suspicion was not unfounded, and B-R Penn

continues to some extent to frame its post-trial argument as if its counterclaim were still in play.

It, for example, lists the elements of a "breach of contract action," and seeks to convince the

Court to find in its favor on that theory.  However, trial courts may alter motion *in limine* rulings

as they receive a fuller view of the facts.  *See Luce v. United States*, 469 U.S. 38, 41-42 (1984)

(A motion *in limine* ruling "is subject to change when the case unfolds" and a "district judge is

free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling.").  And

moreover, B-R Penn raises the payment not only as part of its material breach argument, but also

in other equitable affirmative defenses.  Although B-R Penn failed to convincingly argue prior to

or during trial that the payment demand was legally significant for reasons not addressed in the

Court's motion to dismiss ruling, it has now reframed the legal significance of the payment

demand sufficiently that its post-trial arguments cannot be fully evaluated without considering it.

The September 24, 2020 email will be considered to the extent that B-R Penn relies on it as one

in a series of communications made by the servicers conveying incorrectly that the Second

Forbearance had been denied.

2. *Merits of B-R Penn's Material Breach Defense*

In evaluating the merits of B-R Penn's anticipatory repudiation argument, it is first necessary to break down the parties' respective obligations under the Loan Agreement. It provided for a $46 million loan to B-R Penn—which B-R Penn received—and that B-R Penn would repay that amount, with interest, in monthly installments and a balloon payment of the remaining balance at the maturity date. The forbearance agreements modified B-R Penn's repayment terms by deferring six monthly payments (April, May, June, July, August, and September 2020) and providing that those deferred payments would be repaid gradually, in incremental amounts added to the regular, non-deferred payments resuming in October 2020. The servicers' incorrect payment demand of $1.6 million, and their communications to B-R Penn that the Second Forbearance had been denied, deviated from the repayment terms established by the Second Forbearance. Rather than repaying the second set of forborne amounts 1/24th at a time, the servicers directed B-R Penn to repay those forborne amount in a single, immediate lump sum in October.

B-R Penn argues that the servicers' deviation from the terms of the Second Forbearance deprived it of the benefits of the *forbearance*, which therefore excused B-R Penn's obligation to make any payment at all in October 2020—*i.e.*, excused their repayment obligations under the entire *loan agreement*.

B-R Penn cites several factors that guide the analysis for assessing the materiality of a breach under Pennsylvania law in support of this argument, focusing particularly on one: "the extent to which the injured party will be deprived of the benefit which he reasonably expected[.]"

14

*Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1271 (Pa Super. 2012).[9]  It

also makes a related argument that the failure to disclose the execution of the Second

Forbearance breached the implied covenant of good faith and fair dealing, which includes an

obligation to refrain from "evasion of the spirit of the bargain, lack of diligence . . . and

interference with or failure to cooperate in the other party's performance."  *Somers v. Somers*,

613 A.2d 1211, 1213 (Pa. Super. 1992) (citing Restatement (Second) of Contracts § 205(d)); *see*

*also Daniel B. Van Campen Corp. v. Bldg. & Constr. Trades Council of Phila. & Vicinity*, 195

A.2d 134, 136-37 (Pa. Super. 1963) ("In the absence of an express provision, the law will imply

an agreement by the parties . . . to refrain from doing anything that would destroy or injure the

other party's right to receive the fruits of the contract.").  The duty of good faith is tied to the

express obligations of a contract.  *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418,

434 n.11 (Pa. Super. 2001).  Under the terms of the Loan Agreement, U.S. Bank had the

ability—but no obligation—to grant forbearances if requested by B-R Penn.  B-R Penn's

position is presumably that this provision of the Loan Agreement carried an implied duty that the

servicers would accurately convey information about any forbearances that were granted.[10]

---

[9] The factors in full are:

> a) the extent to which the injured party will be deprived of the benefit which he reasonably
> expected;
> b) the extent to which the injured party can be adequately compensated for that part of the benefit
> of which he will be deprived;
> c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking
> account of all the circumstances including any reasonable assurances;
> e) the extent to which the behavior of the party failing to perform or offer to perform comports
> with standards of good faith and fair dealing.

*Int'l Diamond Imps., Ltd*, 40 A.3d at 1271.

[10] B-R Penn also cites internal communications among Berkadia employees in October, in which they agreed to stop
further communications with B-R Penn about the denial of the forbearance.  B-R Penn claims "[t]hese
communications are admissions that B-R Penn had no way of discovering that the Forbearance 2 Agreement had
been executed or that B-R Penn only had to pay $407,119.21 in October 2020 because Berkadia made an
institutional decision not to communicate with B-R Penn and never provided B-R Penn with a fully executed copy

U.S. Bank did not materially breach the Loan Agreement under either theory.  Under the Loan Agreement, the benefit expected by B-R Penn was a loan of $46 million dollars to be repaid over a ten-year period.  The servicers' incorrect representations that the Second Forbearance was denied cannot be said to have deprived B-R Penn of that benefit—it received $46 million, and neither the forbearance agreements nor the servicers' subsequent communications sought to move up the maturity date or increase the total amount due.  The Second Forbearance modified the Loan Agreement's repayment terms and extended two benefits to B-R Penn—(a) deferring three installments and (b) allowing gradual repayment of those deferred installments.  Even operating under the assumption that deviating from the terms of the Second Forbearance could excuse all of B-R Penn's performance under the loan, B-R Penn did receive a significant portion of its benefits.  Because it took the servicers three months to arrive at the conclusion that the forbearance should be denied, under the mistaken belief that it still could be, B-R Penn was directed to resume payments in October 2020—the same month it was scheduled to resume payments under the Second Forbearance.  In other words, despite the "denial," B-R Penn was effectively allowed to defer its July, August, and September payments.  Of B-R Penn's expected benefits under the loan—$46 million, six deferred monthly payments, and gradual repayment of the deferred amounts—the only one the servicers indicated to B-R Penn it would be denied was the gradual repayment.  But here B-R Penn has yet to make <u>any</u> payment at all on the loan subsequent to the Second Forbearance Agreement.  Determining "[w]hether a breach is so substantial as to justify an injured party's regarding the whole

---

of the Forbearance 2 Agreement."  But as of the date of the communications, October 5, there is no indication that *Berkadia* had in its possession an executed copy of the forbearance agreement.  The forbearance was executed by KeyBank and sent to CW; Berkadia's knowledge of its status came from updates provided by KeyBank.  The decision by Berkadia employees to limit communications with B-R Penn, and leave further discussions about the forbearance denial to CW (an entity that did have an executed copy of the Second Forbearance), did not further impede B-R Penn from discovering the forbearance's actual status.

transaction as at an end 'is a question of degree,'" and the servicers' incorrect representations that approximately $1.2 million of a $46 million loan, money B-R Penn indisputably owed in one form or another, was due immediately was not of a degree great enough to excuse repayment entirely. *Easton Theatres, Inc. v. Wells Forgo Land & Mortg. Co., Inc.*, 401 A.2d 1333, 1338 (Pa. Super. 1979).

b.  <u>Default</u>

In fact, B-R Penn itself backs away from the maximalist argument that the servicers' actions excused any further payment.  It argues that it is not asking that the Court find that it was relieved of its obligations to repay the loan, of which roughly $41 million in principal remains outstanding.  Instead, it requests that the Court "reset the clock" by, essentially, unwinding the servicers' declaration of default and reimposing a schedule of twelve monthly payments in the amount established by the Second Forbearance, followed by a balloon payment.

The core of this argument is that because the first step the servicers took toward declaring the loan in default—the transfer to special servicing—was premised on their incorrect understanding that B-R Penn had failed to make payments deferred by the Second Forbearance, the transfer and subsequent declaration of default were invalid.  In B-R Penn's recounting, the PSA allowed for servicing transfers "when, *inter alia*, 'any Monthly payment (other than a Balloon Payment) is sixty (60) days or more delinquent.'"  Because the July, August, and September payments were covered by the Second Forbearance, B-R Penn argues no payments had been delinquent long enough as of October to permit the transfer.  But B-R Penn presents an incomplete account of the PSA's servicing transfer provision—included in that "*inter alia*," a servicing transfer event occurred if KeyBank (or, in certain circumstances, CW) determined that a default was "reasonably foreseeable."

B-R Penn's October 7 letter allowed for a transfer on this basis.  In that letter, having just had a three-month forbearance supposedly denied, B-R Penn requested an additional *six*-month forbearance and claimed without it, "there is no conceivable way for us to meet our obligations. . . . "  In his deposition, Blumenfeld claimed that the statements in the letter accurately reflected B-R Penn's situation at the time.  At trial, he backtracked and characterized the language used as an attempt to negotiate a favorable resolution.  Regardless, nothing in the letter communicated to U.S. Bank or the servicers that B-R Penn could or would make its scheduled monthly payments.  Rather, the letter constituted a "positive statement of an inability" to perform.  *2401 Pa. Ave. Corp.*, 489 A.2d at 736.

B-R Penn's argument highlights that the reasons provided by the servicers for declaring the loan in default and transferring it to special servicing were somewhat muddled.  Specifically, in recommending the transfer to special servicing on October 15 Berkadia included its— incorrect—assumption that the Second Forbearance had been denied:

> Borrower had entered into an Extended Forbearance Agreement dated 4/17/2020, Borrower was to begin making their forborne payments effective with the 7/1/2020 mortgage payment. The Borrower had then applied for an extension to their forbearance which was denied. The Borrower informed Berkadia that they could not make their future mortgage payments.

However, the "analysis" Berkadia included in the transfer request clarifies that the impetus for the transfer was B-R Penn's stated inability to make *future* payments:

> Borrower was provided with the October 1st 2020 billing statement including the past due forborne amounts.  Borrower informed Berkadia that they did not have the funds to make future mortgage payments.  Berkadia informed the Borrower that any failure to perform under the Forbearance Agreement will result in an immediate transfer to Special Servicing.

Berkadia's ultimate recommendation to transfer the loan to special servicing reiterates this rationale:

> As a condition of granting the Forbearance, the Borrower agreed to the following:

18

. . . If Borrower fails to stay current with the Forbearance Period Repayment Installments and regularly scheduled monthly installment during the Repayment Period ('Forbearance Payment Default'), this Agreement will terminate automatically on the 5th business day following the Forbearance Payment Default.

As Borrower does not intend to make future mortgage payments to Berkadia, we recommend the transfer of this loan to Special Servicing.

Regardless of its assumption that the Second Forbearance Agreement had not been executive, the reason for Berkadia's recommendation was clear and legitimate—B-R Penn's statement that it would be unable ("there would be no conceivable way") for it to meet its payment obligations without further forbearance.

### ii.  Fraud and Unclean Hands

Although not a focal point of its arguments, B-R Penn scatters throughout its Post-Trial Brief isolated contentions that U.S. Bank is also barred by unclean hands from recovery. Unclean hands is an equitable doctrine "applicable when the court, within its discretion, finds the party seeking affirmative relief is guilty of fraud, unconscionable conduct or bad faith directly related to the matter at issue which injures the other party and affects the balance of equities between the litigants." *Equibank v. Adle, Inc.*, 595 A.2d 1284, 1287 (Pa. Super. 1991) (internal citations omitted) (citing *In re Estate of Pedrick*, 482 A.2d 215, 222 (Pa. 1984)). "Although an action of mortgage foreclosure is an action at law in Pennsylvania, equitable relief is nevertheless available in such an action if it can be granted consistently with principles of law." *Union Nat'l Bank of Little Rock v. Cobbs*, 567 A.2d 719, 721 (Pa. Super. 1989) (citing *Fleet Real Estate Funding Corp. v. Smith*, 530 A.2d 919, 923 n.3 (Pa. Super. 1987)).

B-R Penn focuses on what it contends was both fraud and bad faith on the part of the servicers as underpinning its unclean hands defense. "The term 'bad faith' has been defined as 'not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of . . . moral obliquity. . . .'" *Commonwealth v. Brown*, 708 A.2d 81, 85 (Pa. 1998)

(quoting *Black's Law Dictionary* 139 (6th ed.1990)).[11]   The precise contours of "fraud" in the

equitable context is not so easy to pin down.   *See Murray v. Willistown Twp.*, 169 A.3d 84, 93

(Pa. Super. 2017) ("Equitable remedies . . . are distinguished by their flexibility, their unlimited

variety, their adaptability to circumstances, and the natural rules which govern their use."

(quoting *Jackson v. Hendrick*, 321 A.2d 603, 606 (Pa. 1974)); *Cigna Corp v. Exec. Risk. Indem.,*

*Inc.*, 111 A.3d 204, 205 (Pa. Super. 2015) ("[W]hile 'fraud' has no precise definition in equity, it

generally consisted of 'obtaining an undue advantage by means of some intentional act or

omission that was unconscientious or a violation of good faith.'" (quoting 3 John N. Pomeroy, *A*

*Treatise on Equity Jurisprudence* § 873 at 421 (5th ed. 1941))); *Somers*, 613 A.2d at 1213 ("The

obligation to act in good faith in the performance of contractual duties varies somewhat with the

context, and a complete catalogue of types of bad faith is impossible. . . ." (internal citation

omitted)).

At least one Pennsylvania appellate court has required a party asserting fraud in the

context of an equitable defense to foreclosure to prove:

> (1) a representation; (2) which is material to the transaction at hand; (3) made
> falsely, with knowledge of its falsity or recklessness as to whether it is true or false;
> (4) with the intent of misleading another into relying on it; (5) justifiable reliance
> on the misrepresentation; and (6) injury proximately caused by the reliance.

*ESSA Bank & Tr. v. Cerami*, 2015 WL 7355857, at *4 (Pa. Super. Mar. 24, 2015) (citing *Eigen*

*v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. 2005))

(defining fraud in the inducement).   Other sources, though, call into question the requisite intent

necessary to prove fraud as an equitable defense.   *Compare* 59A C.J.S. *Mortgages* § 891 (2022)

("Fraud, as a well-recognized special defense in mortgage-foreclosure actions, involves

---

[11] "'Obliquity' involves a 'deviation from moral rectitude or sound thinking.'"  *Id.* (quoting *Merriam-Webster's Collegiate Dictionary* 802 (10th ed.1996)).

deception practiced in order to induce another to act to their detriment, and which causes that detrimental action."), *and* 26 *Williston on Contracts* § 69:25 (4th ed. 2022) ("[T]he weight of modern authority grants relief on the basis of fraud upon proof of knowledge by the defendant of the falsity of the statement, or on a showing of scienter, or intent to deceive . . . which consists not only of knowledge of the falsity of a representation, but of the maker's knowledge that he or she lacks a reasonable basis for the representation sufficiently aggravated to amount to intent to deceive so as to induce action by the recipient."), *with N.Y. Life Ins. Co. v. Marotta*, 57 F.2d 1038, 1039 (3d Cir. 1932) ("[C]ourts of equity may grant relief . . . although no fraudulent intent on the part of the person making the representation is shown, and even though he may be honestly misled as a result of misapprehension or mistake. All that need be shown in such case is that the representations were false, and actually misled the person to whom they were made."), *and* 3 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 885, at 486 (5th ed. 1941) ("A person making an untrue statement, without knowing or believing it to be untrue, and without any intent to deceive, may be chargeable with actual fraud in equity.").

The distinction between intentional deception and some lesser level of conduct such as negligence or mistake is potentially significant here, as the evidence does not establish that the servicers intended to mislead B-R Penn about the status of the Second Forbearance. Berkadia, the entity that directly communicated updates on the forbearance to B-R Penn, does not appear to have ever received an executed copy of the forbearance agreement itself. And although KeyBank employee Amanda Earl signed the forbearance, the other communications by KeyBank employees introduced at trial consistently reflect that they believed, albeit incorrectly, that there had been no final approval on the forbearance. From the earliest communications provided, KeyBank employees indicated they believed final signoff from CW was required for the

forbearance to take effect.  In an August 18 email, for example, Goll asked Allen Sullivan at

Berkadia for confirmation on one point "before we push it through to be approved by the Special

[CW.  Everything else is ready to go once we get confirmation, we can submit to the Special."

And on August 19, in her email sending the executed forbearance to CW, Goll said: "As

discussed on the first page, KeyBank was hesitant to sign the amendment as we feel the poor

performance and inability to make payments began prior to Covid.  Please provide

approval/denial at your earliest convenience."  Goll then emailed Sullivan, "I have sent the

signed amendment and package to the SS and DCH for approval."  In response to Sullivan's

repeated requests for updates on the approval process, Goll responded in September that "the

SS/DCH are still reviewing it."  When, Felicia Everett-Rounds at CW emailed Goll on

September 23 "that CWCapital Asset Management LLC ('CW'), as Special Servicer for FREMF

2012-K18 in consultation with the Directing Certificate Holder hereby denies the borrower's

request for Forbearance 2.0," this "denial" was promptly communicated to Berkadia and B-R

Penn.

　　　　That employees of a presumably sophisticated commercial entity did not appreciate the

legal effect of signing a contract, or failed to notice that the forbearance agreement as-written

made no provision for "conditional" or further approvals, is somewhat inexplicable.[12]  But the

evidence does not establish that it was intentionally deceptive.  CW, similarly, had in its

---

[12] In April 2021 emails, trying to reconcile the servicers' communications to B-R Penn with the now-discovered (or reviewed) Second Forbearance, Tom Shearer of CW asked Kate Goll at KeyBank to confirm the following sequence of events:

> [T]he Borrower requested an extension of the forbearance for 3 months - July, August and September 2020.  That extension was approved by KeyBank, but was not countersigned by Berkadia, as was the case for the 1st forbearance.  Berkadia sent a demand letter to the Borrower on 9/24/20, as it appears they were unaware that the 2nd forbearance has been approved by KeyBank.

Goll responded that the Second Forbearance had only been "conditionally approved by KeyBank."

possession a signed copy of the forbearance but proceeded under the assumption that it still required final approval. It appears to have relied on KeyBank's representations that this approval was needed, and still possible, rather than reviewing the actual executed document itself. But again, Killick testified that this was the result of an oversight—although CW received the signed forbearance, it was appended to the end of a 95-page email attachment that its employees did not fully review until well after the fact. Like KeyBank's actions, this behavior was perhaps careless and unprofessional, but does not establish intentional misconduct. Both KeyBank and CW appear to have communicated to Berkadia, which then passed on to B-R Penn, their incorrect but genuine understanding of the Second Forbearance's status.[13]

In any event, there is too large a disconnect between the servicers' actions and B-R Penn's response for the unclean hands defense to bar U.S. Bank's recovery. B-R Penn's argument is, essentially, that the servicers' misrepresentations and non-disclosures induced it to default on its payment obligations. But what B-R Penn claims the servicers tried to induce (a $1.2 million payment in October 2020), and the action B-R Penn took in response (declaring an inability to resume full payments) do not correspond. B-R Penn's October 7 letter did not state that it could not make an immediate payment of $1.6 million but could, and intended to, make the originally expected $407,119.21. Instead, it stated in unequivocal terms that it could not "conceivably" meet its obligations without, at a minimum, an additional six-month forbearance

---

[13] B-R Penn also insinuates that the servicers sought to induce its breach because CW "does not get paid" unless the loan was transferred to special servicing; this contention is too speculative to be given weight. B-R Penn has provided no evidence that the servicers had an improper financial motive with respect to the transfer. Rather, the evidence suggests the servicers were skeptical that B-R Penn adequately established whether it had "faced additional hardship from COVID or [if] this was simply a sub-performing property pre-COVID." Moreover, the driver behind the confusion on the servicers' side was KeyBank, which signed the Second Forbearance without realizing that doing so rendered it fully executed, then requested that CW make a final approval determination. CW's purported scheme would have immediately run aground if KeyBank had properly understood the legal effect of signing a contract, and B-R Penn's thin, speculative allegations have not explained why KeyBank would have an interest in helping CW engineer income for itself through a fraudulent servicing transfer.

period.  Indeed, B-R Penn indicated that it would struggle to meet its obligations until the economic effects of the pandemic resolved, as "COVID-19 has proven to be anything but temporary."  This statement goes too far beyond the servicers' demand to conclude that their miscommunications induced it, or that the transfer to special servicing and subsequent declaration of default were inequitable.  The doctrine of unclean hands therefore does not provide B-R Penn a defense against foreclosure.

### iii.   *Freddie Mac Servicing Guidelines*

B-R-Penn argues that application of the Freddie Mac servicing guidelines provide it with a defense against U.S. Bank's foreclosure claim.  For the following reasons, the argument is unsustainable.

As an initial matter, this defense falls into several successive gray areas.  First, the defense was not included in B-R Penn's Answer or raised during trial.  U.S. Bank argues that, as a result, the defense was waived.  B-R Penn makes two counterarguments—that the servicing guidelines defense fits within other affirmative defenses pleaded in its Answer or, alternatively, that Federal Rule of Civil Procedure 15(b)(2) permits post-trial amendment of the pleadings.  As the first counterargument, the servicing guidelines could arguably—under its broadest possible reading—fit under its Fifteenth Affirmative Defense that "Plaintiff's claim is barred . . . because of Lender's pre-occurring breaches of contract"   B-R Penn's argument is more problematic. Rule 15(b)(2) governs issues "not raised by the pleadings" but "*tried* by the parties," and allows post-trial motions "to amend the pleadings to *conform them to the evidence* and to raise an unpleaded issue." (emphasis added).  Here where the Freddie Mac servicing guidelines were never raised at trial or entered into evidence the Rule has no application.

Nevertheless, "affirmative defenses may be raised at any time, even after trial, so long as

the plaintiff suffers no prejudice." *Sharp v. Johnson*, 669 F.3d 144, 158 (3d Cir. 2012); *see also*

*Charpentier v. Godsil*, 937 F.2d 859, 863-64 (3d Cir. 1991) ("[A] defendant does not waive an

affirmative defense if he raised the issue at a pragmatically sufficient time, and the plaintiff was

not prejudiced in its ability to respond." (cleaned up)).  Even if late, B-R Penn raising the defense

is not prejudicial in that, for the reasons set forth below, it does not change the analysis here.

Although the guidelines were not introduced into evidence at trial, B-R Penn requests

(albeit with scant legal argument in support of its request) that the Court now take judicial notice

them.  Federal Rule of Evidence 201 permits judicial notice of facts "not subject to reasonable

dispute" because they "can be accurately and readily determined from sources whose accuracy

cannot reasonably be questioned"; Rule 201 requires judicial notice be taken "if a party requests

it and the court is supplied with the necessary information." Fed. R. Evid. 201(b)(2), (c)(2).

Specifically, B-R Penn requests that the Court take judicial notice of a PDF file of the servicing

guidelines posted on Freddie Mac's website.[14]  Although courts routinely take judicial notice of

information found on government websites, information posted on commercial websites is

treated with greater caution.  *See Sturgeon v. PharMerica Corp.*, 438 F. Supp.3d 246, 259-60

(E.D. Pa. 2020) (citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 236-37 (3d Cir. 2007) for the

proposition that it is "improper" for district courts "to take judicial notice of facts found on a

company's website").  Although B-R Penn characterizes Freddie Mac as a governmental agency,

it is not.  Rather, Freddie Mac was chartered by Congress, *see* 12 U.S.C. § 1452, but "is privately

owned, is structured to function independently of the federal government to a great extent, and

receives no appropriations from Congress. . . ."  *Mendrala v. Crown Mortg. Co.*, 955 F.2d 1132,

---

[14] The Servicing Guidelines, which are available online here: https://mf.freddiemac.com/docs/mf_guide_full.pdf, span 1,101 pages total.

1139 (7th Cir. 1992); *see also Fed. Home Loan Mortg. Corp. v. Shaffer*, 72 F. Supp.3d 1265,

1269-70 (N.D. Ala. 2014) (explaining that the Seventh and Ninth Circuits have determined that

Freddie Mac is not a governmental entity, but rather "a mere quasi-agency").  Despite Freddie

Mac's unique status as a government-chartered private entity, the concerns about commercial

websites raised in *Victaulic*, 499 F.3d at 236-37 (*e.g.*, the difficulty authenticating online sources

and risk of taking "imprecise" promotional puffery at face value) are unlikely to be present here,

and U.S. Bank has not raised any challenges to accuracy or authenticity.  Accordingly, the Court

will take judicial notice of the guidelines.

The third preliminary issue with the defense is the question of whether borrowers like

B-R Penn can assert the guidelines, which create obligations between servicers and Freddie Mac,

as a defense.  In support, it points to Pennsylvania cases allowing mortgage servicing guidelines

promulgated by federal agencies to be used by borrowers as an equitable defense against

foreclosure.  *See Cobbs*, 567 A.2d at 723 ("[W]e hold that appellant may raise the Bank's failure

to comply with the servicing provisions of the VA Lenders Handbook as an equitable defense in

the Bank's mortgage foreclosure action."); *Smith*, 530 A.2d at 923 ("[W]e . . . hold that a

mortgagor of an FHA-insured mortgage may raise as an equitable defense to foreclosure, the

mortgagee's deviation from compliance with the forbearance provisions of the HUD Handbook

and regulations.").  As U.S. Bank points out, it is far from clear that Pennsylvania courts would

extend these holdings to create an equitable defense based in the Freddie Mac servicing

guidelines for commercial borrowers of multimillion dollar loans like the one here.  *See Smith*,

530 A.2d at 923 (linking its holding to the National Housing Act's legislative purpose of

"assist[ing] in providing a decent home and a suitable living environment for every American

family . . . . by making available to low-income families, mortgages which they could not

otherwise afford").  U.S. Bank further argues that "the federal courts that have considered the issue have held that borrowers . . . are not third-party beneficiaries to the Servicer Guide between Freddie Mac and lenders."  *Wells Fargo Bank, N.A. v. Sinnott*, 2009 WL 3157380, at *10 (D. Vt. Sept. 25, 2009) (citing *Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393 (N.D. Ala. 1997), *aff'd*, 140 F.3d 1043 (11th Cir. 1998); *Blair v. Source One Mortg. Servs. Corp.*, 1997 WL 732407, at *2 (E.D. La. Nov. 20, 1997); *In re Thorien*, 2008 WL 5683488, at *8 (Bankr. D. Idaho Nov. 6, 2008)).

Ultimately, it is unnecessary to determine whether these decisions are consistent with Pennsylvania law on third-party beneficiary status or predict how Pennsylvania courts would decide the issue, because even assuming *arguendo* that B-R Penn can invoke the guidelines as a defense, it has not provided evidence supporting its contention that the servicers violated them. It argues that the guidelines "require detailed documentation of loan modifications (including forbearance approvals) including explicitly communication of same to the borrower. . . " and that the servicers violated the guidelines by: (1) failing to maintain Freddie Mac's records and document management software with accurate information regarding Forbearance 2; (2) failing to act in the best interests of Freddie Mac by failing to disclose the executing of Forbearance 2, breaching Forbearance 2 by making improper and incorrect payment demands, and falsely representing to Freddie Mac via email that Forbearance 2 had been denied; and, (3) improperly transferring the Loan to special servicing.

However, the specific sections of the guidelines B-R Penn cites establish much narrower obligations than these purported violations, and do not establish an obligation to provide documentation relating to loan modifications to any entity other than Freddie Mac.  B-R Penn cites Section 36.25 of the guidelines, which requires timely recording of documents and

agreements in Freddie Mac's tracking system,[15] and Section 42.3, which requires 30-day notice

to and written approval from Freddie Mac before transferring a loan to special servicing.  The

guidelines were raised for the first time two months after trial, no evidence or argument having

been presented to the Court at trial on whether the servicers properly documented the Second

Forbearance in Freddie Mac's system, gave the required notice, or obtained approval from

Freddie Mac before transferring the loan to special servicing.  The sole piece of evidence

approaching support for this defense is a November 4, 2020 email in which Goll stated: "the

Forbearance Agreement Extension was executed by us contingent on the DD/SS approval, but it

was denied by the DCH/SS.  I need to delete it out of the documents as the document is no

longer valid."  But it is unclear that Goll meant the Freddie Mac tracking system, as opposed to

KeyBank's own files, and there is no indication that she did in fact delete the file.[16]

　　　　For the reasons set forth above, the Freddie Mac mortgage servicing guidelines, as a

---

[15] In full, Section 36.25 requires:

> When a Servicer receives a Borrower request for Lender consent, the Servicer must use Freddie Mac's Consent Request Tracker (CRT), a shared tool that provides information to track the progress of Borrowers' requests with respect to all Mortgages. Within 2 Business Days after receipt of a Borrower request for Lender consent, the Servicer must:
>
> - Log the request into the CRT
> - Record general information regarding the request, including completing data fields as required, and
> - Assign the next level reviewer of the request as needed
>
> As the review of the request continues, the Servicer must keep the CRT current by timely recording date milestones, status information, any comments and key dates on individual consent requests. For securitized Mortgages, primary servicers, master servicers and special servicers will also have access to and use the CRT to record such information.

Freddie Mac Multifamily, *Multifamily Seller/Servicer Guide PDF* 565 (2022), https://mf.freddiemac.com/docs/mf_guide_full.pdf.

[16] Moreover, B-R Penn's argument is that had the Second Forbearance been properly documented in Freddie Mac's system, B-R Penn would have been informed that it had been executed and would have known to make the correct $407,119 payment.  Even if Goll's email were referring to Freddie Mac's files, she sent it well after the servicers had already informed B-R Penn that the Second Forbearance had been denied and the October due date had passed.

result, do not provide B-R Penn with a defense to foreclosure.

### iv.  *Specific Performance*

In addition to its assertion of the affirmative defenses addressed above, B-R Penn argues that the Court should grant specific performance in the form of imposing a new repayment schedule for the loan.  Specifically, B-R Penn asks that the Court require U.S. Bank to accept repayment in thirteen installments—twelve monthly payments in the amount established by the Second Forbearance, then a balloon payment of the remaining balance.  This, B-R Penn argues, would restore its expectation under the Loan Agreement, of which it was deprived by the servicers' conduct.  U.S. Bank disputes this and characterizes B-R Penn's request as an attempt to write a two-year extension of the original November 2021 maturity date into the parties' agreement.  U.S. Bank is correct in both this characterization and its contention that B-R Penn has provided no reasonable basis for granting such relief.

First, as B-R Penn is the party in breach, there is no reason to allow it to dictate the form of relief to which U.S. Bank is entitled.  B-R Penn cites the Restatement (Second) of Contracts § 369 for the proposition that specific performance "may be granted in spite of a breach by the party seeking relief."  But this is only the rule in instances of a "minor breach, one not serious enough to discharge the other party's remaining duties. . . ."  *Id.* § 369 cmt. a.  Here, B-R Penn stated an inability to resume full payments for twelve additional months and failed to make further payments, actions entitling the servicers to declare a default after accelerating the loan.

Second, B-R Penn casts its requested schedule, which would change the loan's maturity date from November 2021 to November 2023, as vindicating the parties' expectations under the Loan Agreement.  It would not.  Even if the servicers had improperly accelerated the loan solely on the incorrect basis that B-R Penn was late on forborne payments, a two-year extension of the

loan's maturity date still would have no connection to either party's expectations under the agreement.  B-R Penn's expectation under the contract was to make twelve monthly payments *from October 2020 to October 2021* and then make the balloon payment in November 2021. Regardless of what monthly amount was due during that period, the forbearances never purported to affect the maturity date.  The balance of the loan—however much remained—was to be paid in November 2021.  *See Michael and Linda, LLC v. Smith*, 216 A.3d 262, 265 (Pa. Super. 2019) ("When parties have deliberately by their agreement or covenants fixed a time for the performance of an act, a court of equity will be very cautious how it interferes in disregard of it, and thus in effect change the contract which the parties have made."  (quoting *Doughty v. Cooney*, 109 A. 619, 619 (Pa. 1920))).

### C.  Damages

As the Court concludes that B-R Penn breached the terms of its loan agreements with U.S. Bank in October 2020, U.S. Bank's damages will be calculated from that point rather than the November 2021 maturity date.  The damages calculation submitted by U.S. Bank included interest and fees incurred as of May 2022, when the calculation was prepared for trial.  Because these amounts have continued to accrue, U.S. Bank provided the Court with per diem rates of interest so that these calculations could be updated at the date of entry of judgment if the Court found its favor; however, the lender expenses included in U.S. Bank's submitted damages computation are not similarly calculable as a fixed amount.  U.S. Bank will therefore be directed to submit an updated damages calculation, starting at the October 2020 date of default and ending at the date of the Court's accompanying order.

### III.   CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52(a) and based on the foregoing discussion,

the Court makes the following conclusions of law:

1. Defendant B.R. Penn Realty Owner, LP breached its agreements with Plaintiff U.S. Bank National Association in October 2020 when, following the expiration of a six-month period of forbearance, it failed to resume making monthly payments.

2. Plaintiff, through its servicers, did not anticipatorily repudiate or materially breach the loan agreements, and Defendant's default was not excused on this basis.

3. Defendant's breach is not excused under the doctrine of unclean hands.

4. Specific performance instituting a new repayment schedule and extending the loan's maturity date is not warranted.

5. Plaintiff presented evidence at trial of damages based on an October 2020 default in the amount of $48,510,595.34, consisting of the principal balance and interest and fees accrued as of May 1, 2022.  Plaintiff will be directed to submit a revised damages calculation for Defendant's October breach updated to include interest and fees accrued as of the date of the accompanying order.

An appropriate order follows.

**BY THE COURT:**


*/s/ Wendy Beetlestone*
_____
**WENDY BEETLESTONE, J.**